## **AFFIDAVIT OF THOMAS L. OHLSON**

I,    Thomas L. Ohlson, having been duly sworn, do state as follows:

1.   I am a Special Agent with United States Immigration and Customs Enforcement (ICE), formerly the United States Immigration and Naturalization Service (INS), and have been so employed since April of 1999.  Among other duties, I am assigned to investigate the manufacture and sale of fraudulent resident alien cards, which are also known as Forms I-551, or  green cards.  From my experience and training, I know that persons, usually aliens, manufacture and distribute counterfeit green cards, as well as counterfeit social security account number cards (social security cards) and other false identification documents. The counterfeit documents are then sold to aliens who are illegally in the United States or who do not have permission to work in the United States.  I am familiar with the various criminal statutes pertaining to the enforcement of immigration laws which make it unlawful to manufacture and sell green cards, including Title 18, United States Code, Section 1028(a)(2), (knowingly transferring an identification document knowing that such document was produced without authority).

2.    This affidavit is based on my personal knowledge,
information provided to me by other law enforcement officers
and agents of this service, as well as information provided
to me by confidential informants (CI). This affidavit is
not intended to set forth all of the information that I and
other law enforcement personnel have learned during this
investigation, but that which is necessary to support an
application for a criminal complaint charging (**1)Jaime COSTA
("COSTA")** and (2) **Maria Antonia LNU ("MARIA"),** with a
violation of 18 U.S.C. §1028(a)(2).

## BACKGROUND OF THIS INVESTIGATION

3.    On April 08, 2005, SAC/Boston ICE fraud group
agents received information from a confidential informant
("CI-1") that an individual named Jaime COSTA, residing at
37 Freeman Street, Framingham, Massachusetts, manufactures
fraudulent green cards and social security cards.   Two
telephone numbers were provided as a method for reaching
COSTA: (508) 879-0068 and (508) 816-2749.

4.    On April 15, 2005, a second confidential informant
("CI-2"), under the direction of this affiant, placed a
consensually monitored and recorded telephone call to COSTA
at (508) 879-0068 in order to determine if COSTA would sell

2

fraudulent documents to the informant. CI-2 spoke to COSTA, and as a result, COSTA asked CI-2 to call him back in a few days.

5. On April 19, 2005, CI-2, under the direction of the affiant, placed a consensually monitored and recorded telephone call to COSTA at (508) 879-0068 and spoke to him. As a result of this call, a meeting was arranged between CI-2 and COSTA for April 20, 2005 in Framingham, MA. The purpose of the meeting was CI-2 to purchase fraudulent documents from COSTA.

6. A subpoena of subscriber information to Verizon New England for cellular telephone number (508) 879-0068 indicated that Jaime COSTA, of 37 Freeman Street, Floor One, Framingham, Massachusetts, was the listed name on that telephone number account.

FIRST CONTROLLED PURCHASE OF COUNTERFEIT DOCUMENTS

7. On April 20, 2005, the affiant, and other SAC/Boston ICE document fraud group agents met with CI-2 and provided informant with electronic monitoring equipment for the meeting with COSTA. In addition, a physical check of CI-2 and CI-2's vehicle was performed for case integrity purposes with negative results.

3

8.     At approximately 8:15 a.m., ICE agents established surveillance in the area of 165 Concord Street, Framingham, MA., the location of Padaria Brasil Bakery and the proposed meeting place between CI-2 and COSTA. Agents also established themselves at 37 Freeman Street, Framingham. At approximately 8:43 a.m., the vehicle with CI-2 parked on Concord Street near the Padaria Brasil Bakery. At approximately 8:45 a.m., CI-2, under the direction of the affiant, placed a telephone call to (508) 879-0068 and spoke to COSTA, who told CI-2 to come directly to 37 Freeman Street, First Floor, to meet him in about fifteen minutes.

9.     At approximately 8:57 a.m., ICE agents, conducting surveillance at 37 Freeman Street, observed CI-2 park the vehicle in front of 37 Freeman Street (on the street) and exit the vehicle. The building at that location was a yellow, residential apartment building with #37 to the right and #39 to the left clearly marked in the front of the building next to both doors. At approximately 8:58 a.m., CI-2 entered the #37 main door (which was unlocked) and proceeded to the right of the stairs (leading upstairs) to the only door on this level. CI-2 was met by COSTA who was described by CI-2 as a Portuguese-speaking Brazilian male with neck-length black hair and green eyes. After knocking,

4

CI-2 was allowed inside. Two other persons, both Portuguese-speaking Brazilian females, were also located within this apartment. After confirming with COSTA that CI-2 needed a green card and social security card, COSTA wrote down the name of CI-2 and date of birth, and CI-2 signed this name for COSTA. COSTA then took a photograph of CI-2 with an instant camera. COSTA related to CI-2 that he (COSTA) needed to get this photograph to the document manufacturer, and would have the completed documents ready for CI-2 at about 7:00 p.m. on that date. COSTA told CI-2 that he did not make the documents, and only worked for the manufacturer. In addition, he told CI-2 that the set of documents would cost $120.00. Finally, COSTA told CI-2 that he could be reached at another telephone number, (508) 816-2749, and stated to CI-2 that informant should call him later regarding the documents. At approximately 9:04 a.m., ICE surveillance observed CI-2 outside 37 Freeman Street, and entering the informant's vehicle. Following the meeting, ICE agents met with CI-2 and obtained the electronic monitoring equipment.

10. At approximately 2:10 p.m., CI-2, under the direction of the affiant, placed a non-recorded, non-monitored telephone call to COSTA at (508) 879-0068 and

5

spoke to him.  As a result of the call, CI-2 was told that the documents would be ready (for pick-up) between 4:00 p.m. and 5:00 p.m. on that date.

11.  At approximately 5:00 p.m., the affiant and other members of the SAC/Boston ICE document fraud group met with CI-2 and provided CI-2 with $120.00 official funds for the purchase of one set of documents from COSTA.  CI-2 was also equipped with electronic monitoring equipment for the meeting with COSTA, and for case integrity purposes, a physical check was performed on CI-2, and the vehicle, with negative results.  At approximately 5:07 p.m., CI-2 placed a consensually monitored and recorded telephone call to COSTA, under the direction of the affiant, at (508) 816-2749 and spoke to him.  During the call, CI-2 told COSTA that CI-2 would be at the 37 Freeman Street apartment shortly to pick up the documents.

12.  At approximately 5:28 p.m., ICE agents, who had established surveillance at the 37 Freeman Street location earlier, observed CI-2 park the informant vehicle on Freeman Street, and exit the vehicle.  At curbside, CI-2, under the direction of the affiant, placed a telephone call to COSTA at (508) 816-2749.  CI-2 spoke to a female named Maria

6

Antonia LNU, who stated that COSTA was not at the apartment, but that it was acceptable for CI-2 to enter the location to obtain the documents. At approximately 5:29 p.m., CI-2 entered 37 Freeman Street and proceeded to the Floor One Apartment. Maria met CI-2 and allowed CI-2 into the apartment. Maria laid out the finished documents on a table. After CI-2 paid the $120.00 to Maria, which she counted, CI-2 took possession of the documents from the table and exited the apartment. At approximately 5:31 p.m., ICE surveillance observed CI-2 exit 37 Freeman Street, and enter the informant vehicle.

13.   Following the purchase, the affiant and other members of the SAC/Boston ICE document fraud group, met with CI-2 and obtained the completed documents from informant, in addition to the electronic monitoring equipment.

SECOND CONTROLLED PURCHASE OF FRAUDULENT DOCUMENTS

14.   On May 02, 2005, at approximately 2:52 p.m, the affiant and a fellow ICE agent met with CI-2 who made a consensually monitored and recorded telephone call, under the direction of the affiant, to COSTA at (508) 816-2749. The purpose of the call was to arrange a document purchase from COSTA. CI-2 spoke to Maria, who told CI-2 that it would be acceptable for CI-2 to bring photographs to 37 Freeman

7

Street location for documents to be manufactured instead of bringing other individuals to that location for documents to be made. During the phone conversation, CI-2 asked for COSTA and Maria told CI-2 that COSTA was out. The phone call terminated at approximately 2:53 p.m.

15. On May 4, 2005, the affiant and other members of the SAC/Boston ICE document fraud group met with CI-2 and provided CI-2 with electronic monitoring equipment for the meeting with either COSTA or Maria at 37 Freeman Street. CI-2 was also provided with three green-card style photographs for delivery to either COSTA or Maria. CI-2 was instructed to place a name and date of birth on each of the photos.

16. At approximately 8:50 a.m., surveillance conducted by ICE agents was established in the area of 37 Freeman Street. At approximately 9:22 a.m, the vehicle driven by CI-2 was observed parking on the street in front of 37 Freeman Street and CI-2 exited the vehicle. At this time, CI-2 entered the unlocked outside door and proceeded to the Floor One Apartment. CI-2 was subsequently allowed inside by Maria. Also present inside the apartment were three unidentified males and an unidentified female. After showing the three photographs to Maria, CI-2 gave her the photos. CI-2 told Maria that CI-2 needed three green cards

8

and three social security cards. CI-2 stated that CI-2 had previously been charged $120.00 per set by COSTA.  CI-2 asked if COSTA was present and was told that he was out. In addition, CI-2 signed three signatures for the three photographs in a notebook provided to CI-2. Maria stated to CI-2 that the documents would be completed at 5:00 p.m. and that CI-2 could return to that location to obtain the documents.  At approximately 9:27 a.m, CI-2 was observed outside 37 Freeman Street and CI-2 entered CI-2's vehicle. At approximately 9:28 a.m., CI-2's vehicle exited the area. Following the meeting, ICE document fraud group agents met with CI-2 and retrieved the electronic monitoring equipment.

17.  At approximately 4:00 p.m., the affiant and a fellow agent met with CI-2 and provided CI-2 with $360.00 in official funds for the purchase of three sets of fraudulent documents from Maria. CI-2 was also provided with electronic monitoring equipment for the upcoming meeting with Maria Antonia LNU at 37 Freeman Street.

18.  At approximately 4:21 p.m., ICE surveillance, which had been established earlier, observed CI-2 park in front of 37 Freeman Street and exit the vehicle.  At approximately 4:22 p.m., CI-2 was seen entering the outer door at 37 Freeman Street.  At the door to the Floor One

9

Apartment, an unidentified male opened the door and allowed CI-2 to enter. After relating to the male that CI-2 was there to pick up documents ordered earlier, the male entered the kitchen, and re-entered the room with the fraudulent documents. CI-2 noticed that each set was located within its own envelope. The male opened each set and placed all the documents on a table in the room. CI-2 paid the male $360.00 for the documents. At this time, Maria entered the room and took the money from the unidentified male. She, like the male, counted the $360.00. CI-2 related to Maria that CI-2 had many friends that needed documents. CI-2 further related that CI-2 wished to bring additional photographs in the future to 37 Freeman Street, told CI-2 this would be fine, though the manufacturer (which Maria did not identify) would not lower the price of $120.00 per document set. At approximately 4:26 p.m., CI-2 was observed leaving 37 Freeman Street, entering the vehicle, and exiting the area. Subsequently, ICE agents terminated surveillance of the area.

19. Following the document purchase, the affiant and a fellow agent met with CI-2 and obtained the three sets of fraudulent documents and the electronic monitoring equipment. The documents obtained included: (1) a green card

10

in the name of Jaqueline ALMEIDA, dob 04/23/79 with the
number of A063 925 183 and a social security card in the
name of Jaqueline ALMEIDA (#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); (2) a green card
in the name of Patricia DIAS FLORES, dob 11/15/81, with the
number of A044 344 783 and a social security card in the
name of Patricia DIAS FLORES (#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); and (3) a green
card in the name of Fabio GONCALVES, dob 02/13/76, with the
number of A076 632 553 and a social security card in the
name of Fabio GONCALVES (#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). Also returned were
the three photographs presented to Maria by CI-2 earlier on
that date. The green cards bore the photographs given to
CI-2 by ICE agents earlier on that date.

THIRD CONTROLLED PURCHASE OF FRAUDULENT DOCUMENTS

20. On July 25, 2005, at approximately 3:36 p.m., the
affiant and a fellow agent met with CI-2 who made a
consensually monitored and recorded telephone call, under
the direction of the affiant, to COSTA at (508) 816-2749.
The purpose of this call was to arrange a document purchase
from COSTA. CI-2 spoke to COSTA, and as a result of the
call, a document purchase was arranged for July 26, 2005 at
the 37 Freeman Street location. CI-2 was told by COSTA to
come to this location to drop off photographs for the making

of fraudulent documents.  The call terminated at
approximately 3:37 p.m.

21.  On July 26, 2005, the affiant and other members of
the SAC/Boston ICE document fraud group, met with CI-2 and
provided informant with three green-card style photographs
to be delivered to COSTA during their meeting for the
manufacture of three sets of documents.  CI-2 was instructed
by the affiant to place a name and date of birth on each of
the photos and to make three signatures on a separate piece
of paper (made on a white envelope)-- all to be given to
COSTA during their upcoming meeting.  CI-2 was also supplied
with electronic monitoring equipment to be utilized during
the meeting with COSTA. A physical search was conducted on
both CI-2 and the vehicle for case integrity purposes, with
negative results.

22.  At approximately 3:53 p.m., ICE surveillance was
established in the area of 37 Freeman Street. At
approximately 4:07 p.m., ICE surveillance observed CI-2
parking on Freeman Street and enter through the front door
of the building. COSTA opened the door and CI-2 was allowed
inside the Floor One Apartment.  During their meeting, CI-2
told COSTA that CI-2 needed three green cards and three
social security cards. COSTA then told CI-2 that COSTA had

12

two types of green cards from which to choose. COSTA
subsequently presented the two different types of cards.
CI-2 chose the same type of card that CI-2 had purchased
previously. CI-2 was told by COSTA that this type of card
would be available for same-day service because the
manufacturer lived in Framingham.  CI-2 then presented the
three photographs and three signatures to COSTA.  COSTA told
CI-2 that COSTA needed one-half the money ($180.00) at the
present time so that the manufacturer would make the
documents. CI-2 told COSTA that informant would have to
consider this fact and left. After the affiant approved the
payment to COSTA of $180.00 prior to the completion of the
manufacture of the documents, CI-2 re-entered the Floor One
Apartment at 37 Freeman Street at approximately 4:16 p.m.
and paid COSTA $180.00. CI-2 was told by COSTA that the
documents would be completed for delivery at 7:00 p.m.  CI-2
stated to COSTA that informant would call him (COSTA) at
6:30 p.m. to determine the status of the documents.   ICE
surveillance observed CI-2 leave 37 Freeman Street. CI-2 met
with ICE Special Agent Reeves to transfer the electronic
equipment and remaining $180.00 back to Special Agent
Reeves.

23. At approximately 6:00 p.m. CI-2 met with Special Agent Reeves and obtained the remaining $180.00 and electronic monitoring equipment for the second meeting with COSTA. At approximately 6:11 p.m. CI-2 was observed by ICE surveillance, which had remained at the 37 Freeman Street location, park on Freeman Street and enter 37 Freeman Street. COSTA met CI-2 at the door to the Floor One Apartment and told CI-2 that the documents were finished. COSTA walked to the kitchen and returned with the completed documents in an envelope. CI-2 paid the remaining $180.00 to COSTA. Before exiting, COSTA told CI-2 that he (COSTA) would be moving to another location in two months, but would keep the same telephone number. At approximately 6:14 p.m. ICE surveillance observed CI-2 exit 37 Freeman Street and leave the area.

24. After the document purchase, the affiant obtained the completed documents from ICE agents who were currently meeting with CI-2. In addition, the electronic recording equipment was also retrieved from informant. The documents received from CI-2 included: (1) a green card in the name of Marco ANTONIO, dob 12/03/69, A076 632 553 and a social security card in the name of Marco ANTONIO (#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; (2) a green card in the name of Marcelo VIEIRA, dob

14

04/25/80, A073 920 453 and a social security card in the
name of Marcelo VIEIRA (#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); and (3) a green card
in the name of Joao PIRES, dob 02/19/61, A076 392 014 and a
social security card in the name of Joao PIRES (#041-72-
2115). The three photographs presented to COSTA were
returned. The green cards bore the photographs given to CI-2
by ICE agents earlier on that date.

25.  Of the seven green cards purchased from Jaime
COSTA and Maria Antonia LNU, a check of the ICE database
produced information that six alien registration numbers
placed on the cards belonged to persons other than named on
the green cards.  The last alien registration number was
invalid.  At the current time, checks regarding the social
security numbers have not yet been completed.

**CONCLUSION**

26.  Based on the facts set forth above, I believe
there is probable cause to conclude that (1) Jaime COSTA, on
or about April 20, 2005 and July 26, 2005, did knowingly
transfer identification documents knowing that such
documents were produced without lawful authority, in
violation of 18 U.S.C. §1028(a)(2) and 18 U.S.C. §2.

In addition, based on the facts set forth above, I
believe there is probable cause to conclude that (2) Maria

15

Antonia LNU, on April 20, 2005 and May 04, 2005, did

knowingly transfer identification documents knowing that

such documents were produced without lawful authority, in

violation of 18 U.S.C. §1028(a)(2) and 18 U.S.C. §2.

Thomas Ohl

Thomas L. Ohlson
Special Agent
United States Immigration
and Customs Enforcement

**SEP 1 2 2005**
Subscribed and sworn to before me this ____ day of
September, 2005

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

16